IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| VALENCELL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. No. 5:16-cv-00001-D |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| APPLE INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

## VALENCELL'S OPPOSITION TO
## APPLE'S MOTION FOR PROTECTIVE ORDER

Valencell, Inc. ("Valencell") files this opposition to Apple Inc.'s ("Apple") Motion to Transfer (D.E. 69) (the "Motion").

# I. INTRODUCTION

Recognizing that it cannot demonstrate good cause for the restrictive provisions of its internal protective order, Apple claims that the parties agreed on its protective order. But ***Valencell never agreed to use Apple's internal protective order*** or to the provisions therein. While Valencell tried to work with Apple to reach an agreed protective order – just as it was able to successfully do in the related *Fitbit* case, there was never any sort of agreement to use Apple's internal protective order. Ultimately, Valencell's efforts to work with Apple were futile as Apple did not approach the protective order in good faith. Instead, Apple refused to compromise and tried to leverage the fact it was (and still is) withholding all documents regarding the operation of the accused heart rate monitor into strong-arming Valencell into agreeing to an overly restrictive protective order that is clearly designed to frustrate discovery. Notwithstanding the impropriety of Apple's approach, which violates its discovery obligations under the Local Rules, good cause does not exist for the provisions of Apple's internal protective order.

While a protective order is appropriate in this case, it is improper to adopt provisions solely designed to protect against Apple's wholly speculative concerns. Rather, the protective order should be narrowly tailored to the needs of the case. To that end, the *Fitbit* Protective Order, which results from a co-pending action involving the same patents and technology, addresses all reasonable concerns without impairing Valencell's ability to develop its case. Valencell based the *Fitbit* Protective Order on the Eastern District of Texas's Model Protective Order for patent cases and, as such, it does not favor the interests of one party over the other. Conversely, Apple seeks to enter its ***internal protective order***, which it drafted to advance only ***Apple's*** interests, including making litigation more difficult for the opposing party. Lacking a credible argument for why the *Fitbit* Protective Order will not address the needs of the case, Apple claims that the parties did not

1

meet and confer. Remarkably, Apple makes this claim while simultaneously stating that it "stated that Valencell's draft [protective order] was unacceptable in numerous respects" (D.E. 70 at 2) and subsequently arguing that a motion for protective order is not a discovery motion (D.E. 60 at ¶ 2). Notwithstanding the fact that on multiple occasions the parties conferred regarding the *Fitbit* Protective Order, Apple's claim that it avoided conferring by unilaterally declaring the *Fitbit* Protective Order unacceptable is telling about how Apple approaches discussions.

Since April, when the parties first began discussing a protective order, Valencell went to great lengths trying to work with Apple, but Apple has remained unreasonable hoping to improperly delay its discovery obligations as long as possible. Apple declared the *Fitbit* Protective Order "unacceptable for numerous reasons," **but refused to articulate these reasons**. Apple declared the protections under Local Patent Rules "inadequate for several reasons," ***but again declined to articulate such reasons***. Apple refused to make any substantive changes to its proposed protective order, and yet could not (and cannot) explain why the highly restrictive provisions it seeks are necessary in this case. And now, rather than making a case for such provisions to the Court, Apple claims that ***its redline to its proposed protective*** order represents agreement by the parties to such provisions. The Court should not reward Apple's refusal to have good faith discussions regarding the protective order.

It is also worth noting that Valencell was able to reach an agreed protective order in the related *Fitbit* case. Not only does this indicate that the *Fitbit* Protective Order provides the necessary protections for highly sensitive materials, it also evidences that Valencell approaches discussions in good faith. The fact that Valencell based this protective order off the neutral model order from the Eastern District of Texas further suggests that it is well-suited for the needs of this case. While Apple praises the Northern District of California's "well-established standards for

handling the types of sensitive materials at issue here" (D.E. 47 at 6), it neglects to mention that over 43% of all patent litigations are filed in the Eastern District of Texas – by far the most of any other jurisdiction. The Eastern District of Texas' model protective order is well suited for the needs of this case (or any other patent case). Apple does not have a legitimate complaint regarding this model order. Instead, the real reason that Apple seeks entry of its own proposed protective order is that it hopes to gain a strategic advantage in this case. But because Apple cannot show good cause for the restrictive provisions in its protective order, it repeatedly relies on fictitious claims that Valencell agreed to such provisions. This is categorically false and when Apple's motion for entry of its proposed protective order is evaluated on the merits, it fails.

## II. BACKGROUND

A complete background to the parties' protective order discussions is set forth in the Memorandum in Support of Valencell's Motion for Protective Order. D.E. 43 at 2-5. While not wishing to rehash the entire history, Valencell believes it necessary to address certain statements in Apple's "Background" Section so that the briefing presents the Court with an accurate picture. On April 6, Valencell provided Apple with a draft protective order (the "*Fitbit* Protective Order"). Rastegar Decl. at ¶ 2. On April 20, the parties held the Rule 26(f) conference. *Id.* at ¶ 3. During the conference Apple stated that the *Fitbit* Protective Order was unacceptable, ***but would not offer any explanation for this claim***. *Id.* Indeed, Apple still has not explained why it contends the *Fitbit* Protective Order is unacceptable and continues to rely on its *ipse dixit* reasoning. *Id.*

Believing it incumbent on the parties to try and reach agreement on a protective order, Valencell stated that it would ***consider*** Apple's proposed protective order. *Id.* But Valencell's willingness to consider Apple's proposed protective order was not an agreement to use that order – **Valencell never agreed to use Apple's proposed protective order**. *Id.* ¶ 4. Further, when

3

Valencell agreed to consider Apple's internal protective order, it contemplated that Apple would be willing to compromise on various provisions – something that did not happen. *Id.* Throughout the protective order negotiations, Apple refused to compromise on any substantive provisions – despite the fact that it could not explain why the provisions it sought were necessary. *Id.* at ¶ 5. Apple's conduct was inconsistent with its obligation to confer in good faith. If the Court requires evidence as to which party operated in a reasonable and professional manner during the protective order negotiations, it need look no further than the *Fitbit* case, where Valencell and Fitbit were able to agree on a protective order without the need for Court intervention.

Finally, Apple's claim that it sought to "keep discovery moving" is insincere. D.E. 70 at 3. Apple was and is using the absence of a protective order to improperly withhold responses to Valencell's discovery requests. Rastegar Decl. at ¶ 6. On June 16, **Valencell approached Apple** requesting Apple produce its responsive documents as "Attorney Eyes Only" and offered "to limit access to such materials to the outside counsel of record for Valencell and their staff." D.E. 70-14. Valencell's request tracked the language of Local Patent Rule 302.2, which provides:

> If any document or information produced under these Local Civil Rules is deemed confidential by the producing party and if the court has not entered a protective order or otherwise ruled on the confidentiality of the document or information, then until a protective order is issued by the court, the document shall be marked "confidential" or with some other confidential designation (such as "Confidential Outside Attorneys Eyes Only") by the disclosing party and disclosure of the confidential document or information shall be limited to each party's outside attorney(s) of record and the employees of such outside attorney(s).

Local Patent Rule 302.2. Despite this, **Apple declared the Local Rule was "inadequate for several reasons,"** but did not identify those reasons. *Id.* Apple's refusal to produce its confidential materials until 30 days after the Court enters a protective order is a clear violation of Local Patent Rule 302.2. Despite this Apple now claims that Local Patent Rule 302.2. D.E. 71 at 4-5. This

4

position, which Apple did not bother to articulate until after Valencell moved to compel compliance with Local Patent Rule 302.2, is untenable, the rule expressly states "until a protective order is issued by the court, the document ***shall be marked*** 'confidential' or with some other confidential designation … and disclosure of the confidential document or information ***shall be limited to each party's outside attorney(s) of record*** and the employees of such outside attorney(s)." Local Patent Rule 302.2 (emphasis added). The word "shall" created an obligation for Apple, not an option. Nevertheless, Apple tried to leverage its failure to comply with its discovery obligations as an opportunity to gain a strategic advantage in the case. Specifically, Apple wanted Valencell to agree to provisions that would benefit Apple's transfer motion, allow Apple to raise baseless unenforceability claims, and indefinitely delay source code production. *Id.* Valencell declined these provisions, but did offer a compromise that addressed any legitimate concerns Apple had. *Id.* Not surprisingly, after its self-serving provisions had been stripped from the proposal, Apple had no interest in an interim agreement and did not make any attempt to reach a compromise. D.E. 51-15. For Apple to now claim that it sought to "keep discovery moving" is risible. Apple has made no such effort, instead it has repeatedly opted for delay and now it seeks a protective order that will further impede Valencell's ability to develop its case.

### III. LEGAL STANDARD

Pursuant to Rule 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: … requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." FED. R. CIV. P. 26(c)(1). "The party requesting the protective order must show good cause." *Vallejo v. Alan Vester Auto Group, Inc.*, 5:07-CV-343-BO, 2008 WL 4610233, at *2 (E.D.N.C. Oct. 16,

5

2008). "To establish good cause" under Rule 26, "courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Duke Energy Progress, Inc. v. Alcan Aluminum Corp.*, 5:08-CV-460-FL, 2015 WL 1058229, at *2 (E.D.N.C. Mar. 11, 2015) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102, n. 16 (1981)). Requiring a specific demonstration of facts rather than speculative statements "furthers the goal that the court grant *as narrow a protective order as is necessary* under the facts." *Vallejo*, 2008 WL 4610233, at *2 (emphasis added).

## IV. ARGUMENTS AND AUTHORITIES

### A. Valencell Did Not Stipulate to Apple's Protective Order.

Contrary to Apple's claim, Valencell did not stipulate to Apple's proposed protective order. During the Rule 26(f) conference, after Apple stated without explanation that the *Fitbit* Protective Order was "unacceptable," Valencell stated that it would *consider* Apple's proposed protective order. D.E. 43 at 2-3. Valencell considered it, sent Apple a redline, and Apple rejected every substantive change Valencell proposed.

Valencell made good faith efforts to reach an agreement on the protective order by sending Apple two reasonable protective orders: (1) the agreed *Fitbit* Protective Order and (2) Valencell's May 4 redline to Apple's proposed protective order. Apple did not return Valencell's good faith efforts. Apple refused to compromise on the substantive provisions in its proposed protective order, while improperly withholding discovery as leverage to force Valencell to agree to Apple's one-sided proposal. Valencell never gave-in, and thus no stipulation existed between the parties. The Court should not reward Apple's efforts to strong-arm Valencell into an unfair protective order. Apple knows that it acted improperly, and that is why Apple is now trying to conflate the facts.

6

### B. Apple's Proposals Regarding the "Disputed Provisions" Demonstrate that Its True Objective Is to Gain a Tactical Advantage in the Case.

A need does not exist for the restrictive provisions in Apple's proposed protective order. Nevertheless, Apple insists upon such provisions because they benefit Apple by frustrating Valencell's ability to develop its case. Apple does not even attempt to demonstrate specific facts necessitating its proposed restrictions. Instead, Apple makes speculative claims regarding farfetched scenarios and tries to shift the burden onto Valencell to show why these provisions are unreasonable, by boldly proclaiming, without support, that "the weight of reasoned authority" supports them. Notwithstanding the fact that Apple's proposed provisions are unreasonable and unwarranted, Apple's claim is inaccurate, absent a showing of good cause, courts do not adopt the blanket restrictions that Apple seeks to impose.

Further, protective orders from the Eastern District of Texas are a useful resource for this Court. The Eastern District of Texas handles more patent cases than any other district in the country. In 2015, 43.6% of all patent cases were filed in the Eastern District of Texas – more than ten times the number that were filed in the Northern District of California. Ex. A. Remarkably, when compared to the Northern District of California, the Eastern District of Texas achieves an average time to trial that is three months faster, despite having fewer judges and more cases per judge. Rastegar Decl. at ¶¶ 8-9; Ex. B at 5, 9. One of the reasons the Eastern District of Texas is able to handle this significant case load so efficiently is that it adopted a model protective order that protects the parties' legitimate interests, while not sowing the seeds for further discovery disputes down the road. This is why Valencell used the Eastern District of Texas model order as a template for the *Fitbit* Protective Order.

Conversely, Apple's proposed protective order is based on Apple's **internal** template, which no court has endorsed and will likely result in continued motion practice before the Court.

7

Case 5:16-cv-00001-D   Document 75   Filed 09/19/16   Page 8 of 20

For example, Apple's proposed protective order sets arbitrary page limits on the amount of source code that may be printed, including limiting the printing of continuous block code to a paltry five pages. Not only does Apple offer no basis for such limits, but anyone who is familiar with source code would recognize this limit to be equivalent to asking someone to water their lawn with an eye dropper. If the protective order includes such arbitrarily low limits, it will all but guarantee that Valencell will have to move the Court for relief from this provision.

### 1. *Apple's Proposed Export Restrictions Are Unwarranted.*

Good cause does not exist for Apple's proposed export restrictions. Initially, Apple argued that the export restriction was necessary to ensure compliance with U.S. Export Administration Regulations. But when Valencell pointed out that the Protected Materials at issue in this case were unlikely to trigger such restrictions, Apple began to claim that the export restrictions were necessary to ensure enforceability of the protective order.

Apple's enforceability concern is undermined by the fact that Apple has on numerous occasions agreed to protective orders that allow for the export of protected materials. *See, e.g.,* D.E. 43-15, Agreed Protective Order in *Ericsson, Inc., et al. v. Apple, Inc.* (E.D. Tex) at ¶ 10(d)(xiv); Ex. C, Protective Order in *Cellular Communications Equip. LLC v. Apple, Inc.* (E.D. Tex.) at ¶ 6.3. Nevertheless, Apple argues that courts "frequently prohibit exporting protected materials outside the United States" in recognition of the territorial limits on their power. D.E. 70 at 12. As an initial matter, the three agreed protective orders that Apple cites hardly represent the reasoned analysis of a court weighing the issue. Rather, they represent situations where the parties *agreed* to a provision that likely had no impact on the case. In fact, when courts have addressed

Apple's proposed export restrictions, they have declined to adopt them. *See, e.g.,* D.E. 43-14, *Long Corner Consumer Elecs. LLC v. Acer America Corp., et al.*¸ 2:13-cv-00998 (E.D. Tex.), at 3-4.[1]

Apple's concern that the Court cannot enforce the protective order outside the United States assumes, without basis, that Valencell's expert will intentionally violate the protective order. Experts are generally respected members in the field and not nefarious characters, it is unreasonable to assume that such individuals will set out to violate the protective order. And there is no basis to assume an expert located outside of the United States poses any more threat than one located within the United States. Valencell notes that the export restrictions pose a real issue in this case. As Apple is aware, Valencell is considering using a consultant who resides in Canada, and Apple's proposed provision would make working with this individual impractical. D.E. 43 at 10. Valencell's choice of expert should not be restricted by an unnecessary export restriction. Particularly, when Apple has expressly agreed to experts in Canada reviewing its protected materials in other cases. *See, e.g.,* D.E. 43-15, Agreed Protective Order in *Ericsson, Inc., et al. v. Apple, Inc.* (E.D. Tex) at ¶ 10(d)(xiv).

Further, Apple's claim that a wholesale ban on exporting is necessary because it *might* produce materials in this case that are subject to export control legislation is overly restrictive – particularly when it is unclear (and likely doubtful) that the materials in this case are subject to such regulations. Rather than adopting a wholesale ban on exporting Protected Materials, the more reasoned approach would be for Apple to notify Valencell when it believed that specific Protected Material was subject to such regulations. But this approach is unacceptable to Apple because its

---

[1] While not in the caption, Apple was a Defendant in the *Long Corner* case.

9

true goal is to restrict Valencell's choice of expert. Apple cannot show good cause exists for its export restrictions.

### 2. *Apple's "Prosecution" Bar Is Overly Broad and Intended to Limit the Pool of Potential Experts.*

Apple's proposed "prosecution" bar is not narrowly tailored to the needs of the case. Instead, Apple seeks to prohibit numerous individuals from participating in a wide range of activities, regardless of whether such individuals engage in competitive decision making – as required by the law. As with its export restrictions, Apple proposed prosecution bar is designed to frustrate Valencell's ability to select an expert. While Valencell does not oppose a prosecution bar, it opposes an unfair bar that provides Apple with an advantage by disproportionally impacting Valencell and its expert. The prosecution bar in the *Fitbit* Protective Order (D.E. 43-2 at ¶ 11) protects the parties' sensitive materials without affording either party a strategic advantage.

#### a. *Apple cannot show a particularized need for its prosecution bar.*

Federal Circuit law governs whether a protective order should include a patent prosecution bar. *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010). As the party seeking entry of a prosecution bar, Apple bears the burden of showing good cause exists for adopting the proposed prosecution bar. *Id.* To do this, Apple must first "show that there is an 'unacceptable' risk of inadvertent disclosure of confidential information," which is "determined by the extent to which [the affected individuals are] involved in 'competitive decision making' with [their] client." *NeXedge, LLC v. Freescale Semiconductor, Inc.*, 820 F. Supp. 2d 1040, 1043 (D. Ariz. 2011). Apple must demonstrate this risk on an individual basis, a mere generalization of risk is insufficient. *See In re Deutsche*, 605 F.3d at 1378. Only after Apple demonstrates an unacceptable risk of disclosure, does the Court balance this risk against the harm to Valencell. *NeXedge*, 820 F. Supp. 2d at 1043.

Apple has not even attempted to make a showing as to why specific individuals pose an unacceptable risk of inadvertent disclosure. Instead, it seeks, without explanation, a prosecution bar that prevents **_any_** individual, including an expert, who receives **_any_** Attorney's Eyes Only materials, from having **_any_** role in prosecuting patents relating to **_any_** physiological technology. The Federal Circuit has deemed the reasoning behind such bars "shortsighted." *In re Deutsche*, 605 F.3d at 1379. Apple's proposed bar is particularly problematic for potential experts – who are very likely to be active inventors. Indeed Valencell's counsel has talked to multiple potential experts in this matter who have stated that Apple's proposed prosecution bar would prohibit their involvement in the case. Rastegar Decl. at ¶ 10. As a result, Apple's proposed prosecution bar reduces the field of potential experts. Moreover, the terms of Apple's protective order reveal that the reduced field of experts disproportionally affects Valencell. Apple's proposed prosecution bar allows Apple to give written consent waiving the prosecution bar for its expert witnesses. D.E. 70-1 at ¶ 6(b). Consequently, the prosecution bar only impact Valencell's ability to select an expert, not Apple's.

   b. *The scope of Apple's prosecution bar is excessive and unnecessary.*

The technology covered by Apple's prosecution bar is also overly broad. Valencell agrees that the scope of discovery should inform the breath of the prosecution bar, but disagrees with how Apple interprets this scope. This case concerns whether the heart rate monitor in the Apple Watch infringes the asserted claims of the patents-in-suit. As such, the claims, which represent the field of the invention for the patents-in-suit, generally define the scope of discovery. Despite this, Apple seeks a prosecution bar that applies to a broad range of technology that has no relation to this litigation. There are countless technologies that fall within Apple's proposed scope of "the functionality, operation, and design of technology for monitoring, sensing, collecting, analyzing, or displaying physiological and motion-related information" that have nothing to do with heart

rate monitoring. The result of Apple's overly broad technical scope is that the prosecution bar will preclude individuals from innovating in this broad range of technologies regardless of whether the materials they actually received had anything to do with such technologies. Again this provision disproportionally impacts Valencell's ability to retain an expert, as experts often innovate in multiple technologies and are unlikely to forego their rights to innovate in such a broad range of technologies.

       *c. Apple cannot show a need for an acquisition bar.*

The breadth of the prohibited activities in Apple's prosecution bar is also overly restrictive. Apple makes no attempt to show that its acquisition bar is necessary in this litigation. Instead, Apple relies on three cases to suggest that there is some automatic concern that litigation counsel may use knowledge of Attorney's Eyes Only materials to advise its client on patent acquisition. But these cases are the exception rather than the rule, there is a reason that acquisition bars have not made it into the Model Protective Orders from other courts (e.g., the Eastern District of Texas and the Northern District of California). Moreover, Apple's case law does not support the broad bar which it seeks. In *EPL Holdings*, the Court adopted "a ***limited patent acquisition bar*** that prohibits counsel from advising clients as to which patents to acquire to the extent such patents are ***narrowly related to the subject matter of this litigation***, but allows counsel to advise on legal matters involving such patents, including validity. Further, the bar must not apply to settlement negotiations of litigations." *EPL Holdings, LLC v. Apple Inc.*, C-12-04306 JST JSC, 2013 WL 2181584, at *5 (N.D. Cal. May 20, 2013) (emphasis added). And, as with Apple's prosecution bar, the proposed acquisition bar covers a wide range of technologies that will have nothing to do with the materials produced in this case. It is illogical to adopt an acquisition bar that far exceeds the scope of technical materials disclosed by Apple. Accordingly, good cause does not exist for Apple's acquisition bar.

12

> d. *Apple's prosecution bar unreasonably restricts Valencell's rights in post grant proceedings.*

Apple fails to demonstrate an unacceptable risk that warrants limiting Valencell's rights in the event of post grant proceedings. As Apple well knows, "the risk of inadvertent misuse of Apple's confidential information does not outweigh the prejudice to [the patentee] if the prosecution bar is applied to [reexamination proceedings]." *Mirror Worlds, LLC v. Apple, Inc.*, No. 08-cv-88, 2009 WL 2461808, at *2 (E.D. Tex. Aug. 11, 2009). Because "claims can only be narrowed during reexamination" and because it is not in Valencell's best interest to limit claim scope to specifically target Apple's product, "the risk of harm to Apple is already greatly limited." *Id.* This reasoning has been echoed on numerous occasions: "Defendants' concern about the use of its highly sensitive in reexamination is undercut by the fact that claims can only be narrowed, not broadened, during reexamination … it is highly unlikely that Plaintiff would seek to narrow its claims to cover any single defendant at the risk of excluding the remaining accused infringers." Ex. D, *GeoTag v. Frontier Commn's Corp.*, et al., No. 10- cv-00570, Slip-Op at 11 (E.D. Tex. Jan. 8, 2013) (ruling that defendants failed to show good cause for exclusion of reexamination proceedings); *see also Doc. Gen. Corp. v. Allscripts LLC*, No. 08-cv-479, 2009 WL 1766096, at *2 (E.D. Tex. June 23, 2009) (same). Again, Apple makes no attempt to show that an unacceptable risk exists if Valencell's counsel participates in post grant proceedings. Moreover, Apple's motion misstates Valencell's issue with restricting its role in post grant proceedings. It is not that Apple's prosecution bar precludes Valencell from participating in a post grant proceeding, it is that Apple contends that if Valencell's litigation counsel participates in a post grant proceeding, it must forego its right to amend its claims. This is nothing more than an attempt to deprive Valencell of its rights in post grant proceedings. Simply because Valencell's litigation counsel may participate in a post grant proceeding does not mean that Valencell cannot have non-litigation counsel separately

13

participate in the same proceeding for the purpose of pursuing amended claims. Apple offers no explanation for how this presents an unacceptable level of risk.

    *e. The length of Apple's prosecution bar is excessive.*

  The duration of Apple's proposed prosecution bar (two years after final resolution of this action, including appeals) reveals that Apple is less concerned with guarding against inadvertent disclosure and more intent on artificially narrowing the field of potential experts for Valencell. This is a burgeoning technology field and Apple is demanding that an expert forgo seeking protection for his inventions for what could easily exceed five years. This excessive duration is unnecessary as "the need for a prosecution bar diminishes over time as the protected information becomes stale and outdated." James Juo and David J. Pitman, *A Prosecution Bar in Patent Litigation Should Be the Exception Rather Than the Rule*, 15 Va. J.L. & Tech. 43 (2010) (advocating prosecution bars that run for one year from the disclosure of protected information). Moreover, the duration of the proposed prosecution bar is likely to impact only Valencell's expert, as Apple will give its expert written consent to engage in prosecution activities.

    **3.** ***In Order to Know the Scope of a Prosecution Bar, Attorneys Should Appear in the Case Prior to Receiving Attorneys' Eyes Only Materials.***

  Apple's proposed prosecution bar creates a need for attorneys to appear in the case prior to receiving attorneys' eyes only materials. Apple's proposed prosecution bar restricts the activities of "anyone who receives" Attorney's Eyes Only materials. D.E. 70-1 at ¶ 6(b). Consequently it is necessary to know who received such information. By requiring attorneys to appear in the case before receiving Attorney's Eyes Only materials, there will be a known, discrete list of individuals that are subject to the prosecution bar. Absent such a requirement, the producing party will not know who is subject to the prosecution bar. This lack of certainty regarding who is subject to the prosecution bar creates problems down the road, as there will be open questions as to whether

14

individuals involved in prosecution activities were subject to the prosecution bar. Indeed Apple's motion already suggests that it (incorrectly) believes Valencell's prosecution counsel, who is at the same firm as Valencell's litigation counsel, will have access to Apple's protected materials. Valencell's prosecution counsel at Myers Bigel will not have access to Apple's Attorney's Eyes Only materials. Further, the provision in the *Fitbit* Protective Order that only attorneys of record may access Attorney's Eyes Only materials, guards against Apple's supposed concerns. Valencell's future patents should not be burdened by baseless unenforceability claims.

### 4. *Apple's Source Code Restrictions Are Intended to Frustrate Valencell's Ability to Develop its case.*

Valencell does not dispute that source code is entitled to heightened protections, but such protections should be narrowly tailored to address the risks without impairing a party's ability to develop its case.

#### a. *The protective order should not set arbitrary page limits.*

Apple's proposal sets arbitrary limits on source code on source code printouts without making any attempt to connect these limits to the needs of the case. Apple proposes the same default limits from its internal protective order because they impede Valencell's ability to develop its case. It is worth noting that Model Protective Orders from other courts (e.g., the Eastern District of Texas and the Northern District of California) do not attempt to set page limits on source code production. Indeed, Apple's case law expressly rejected the notion of setting page limits in the protective order, concluding that "placing a blanket limit on the number of source code pages is unhelpful." *EPL Holdings, LLC v. Apple Inc.*, C-12-04306 JST JSC, 2013 WL 2181584, at *6 (N.D. Cal. May 20, 2013). Setting a page limit at the outset of litigation, before it is possible to know exactly what source code is at issue, invites more problems than it solves.

Nevertheless, Apple seeks to impose page limits that have no correlation to the issues in this case. At this point in the case, Apple has not identified either the source code files at issue or the total amount of source code on the Apple Watch. In light of this, it simply does not make sense to cap source code production at five pages of continuous block code or 10% of the total code. Apple offers no explanation for how it arrived at these numbers or why they are allegedly reasonable. And given that source code files are routinely hundreds of pages in length and often heavily commented, it is likely no such explanation exists. Further, it is not reasonable for Apple to demand that Valencell propose a page limit when Valencell has no idea regarding the quantity or structure of the source code on the Apple Watch. Simply put, it is unfair to arbitrarily limit the number of continuous pages of source code that may be printed when Apple has made no effort to identify the page count of the relevant portions of source code.

> b. *Apple's proposed protective order sets unreasonable limits on the number of paper copies.*

Apple's protective order also imposes unreasonable restrictions regarding the number of copies of printed source code that Valencell may have and Apple's right to access the source code review logs on almost no notice. Specifically, Apple seeks to limit Valencell to no more than three copies of printed source code and to be able to inspect the source code review logs on one day's notice. D.E. 70-1 at ¶ 11(ix). At certain junctures in the case, such as trial preparation, it is likely that more than three individuals will need to have concurrent access to the printed source code. At a minimum, Valencell should be allowed up to five copies of printed source code. Further, Apple's demand that it be able to inspect the source code review logs on one day's notice is unreasonable. There is no need for this restriction and, as a practical matter, there are times in a case when accommodating inspection on one day's notice will not is impractical. For example, Valencell

should not have to accommodate an inspection the night before opening arguments. A more reasonable provision would require one week's notice.

   c. *The protective order should not attempt to define every possible scenario for which a party may use source code.*

Apple's proposal also unnecessarily restricts the purpose for which source code may be printed. The source code review procedure calls for the receiving party to travel to the source code computer and, after reviewing the source code, to request specific portions of code that it wants in paper form. While both proposed protective orders limit the purpose for which the receiving party may request such printed source code, the restrictions in Apple's proposed protective order are unnecessary. There is simply no reason why it is necessary to try to define all purposes for which source code may be printed. Again, Apple makes no attempt to show a need for these restrictions or why scenarios not listed in its protective order are improper. Moreover, Apple's use of the phrase "reasonably necessary" in three other parts of its internal protective order undermines its claim that the phrase is ambiguous.

## V. CONCLUSION

For the foregoing reasons, Apple's motion should be denied.

Dated: September 19, 2016                                      Respectfully submitted,

                                                               */s/ Jonathan H. Rastegar*
                                                               Jonathan H. Rastegar

                                                               Lynne A. Borchers
                                                               N.C. Bar No. 32386
                                                               **MYERS BIGEL & SIBLEY, P.A.**
                                                               4140 Parklake Avenue, Suite 600
                                                               Raleigh, North Carolina 27612
                                                               919-854-1400 (telephone)
                                                               919-854-1401 (facsimile)
                                                               lborchers@myersbigel.com

                                                               Jeffrey R. Bragalone
                                                               (admitted *pro hac vice*)
                                                               Texas Bar No. 02855775
                                                               Patrick J. Conroy
                                                               (admitted *pro hac vice*)
                                                               Texas Bar No. 24012448
                                                               Jonathan H. Rastegar
                                                               (admitted *pro hac vice*)
                                                               Texas Bar No. 24064043
                                                               **BRAGALONE CONROY PC**
                                                               2200 Ross Avenue
                                                               Suite 4500W
                                                               Dallas, TX 75201
                                                               Tel: (214) 785-6670
                                                               Fax: (214) 785-6680
                                                               jbragalone@bcpc-law.com
                                                               pconroy@bcpc-law.com
                                                               jrastegar@bcpc-law.com

                                                               Attorneys for Plaintiff
                                                               **VALENCELL, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which pursuant to Local Civil Rule 4.1(e), constitutes service on counsel of record for Defendant.

Dated: September 19, 2016                                      Respectfully submitted,

*/s/ Jonathan H. Rastegar*
Jonathan H. Rastegar